I understand that we will now call our first case, which is Abreu v. Attorney General of the United States, case number 21-1209. Counsel, how much time would you like to reserve for rebuttal? Three minutes. Randy? Pardon, what did he say? Three minutes. Thank you, Your Honor. May it please the Court, Christopher Healy for Mr. Abreu. Could you speak up a little bit, please? Yes, Your Honor. Christopher Healy for Mr. Abreu. The deference that this Court affords to the BIA carries with it an obligation for the agency to fully and fairly consider all of the evidence in the record. I'm missing you. Your voice is trailing off a bit there. The agency here did not uphold its end of the bargain in fairly and fully considering the evidence in the record. Let's assume that we agree with you in that. I don't think they adequately discharged the two-step inquiry under Mirri. But what is there in the record to get you over the second prong? Let's assume that you could get past the first prong in terms of the likelihood of torture if you were to go back to the Dominican Republic. What is there to show some connection, a sufficient nexus between, it's Tito primarily here, but anybody else who might be a persecutor? And either the Dominican government or that the Dominican government would be willfully blind or basically acquiesced to any kind of torture that it might be subjected to by Tito or anybody else. Your Honor, there's several things, some of which were entirely ignored by the agency. The first thing that I would point to is Mr. Abreu's credible testimony, and it's also corroborated by Mr. Espinosa's affidavit, that Tito has substantial economic power such that he could bribe the authorities to look the other way in response to his… Really? Substantial economic power? Where's that coming from? There's some reference to his being wealthy or being a man of means, but does that translate to having power to cause the government to be willfully blind? I think it does for two things. So economic power is something that Mr. Espinosa said in his affidavit. There's no challenge to the credibility of that affidavit here. The country conditions evidence, in particular I'm thinking about the 2019 State Department report, corroborates the notion that there is widespread bribery and corruption in the Dominican security forces and particularly among the police forces. The State Department report indicates a lot of reports from officers in the Dominican Republic that they were ordered by their commanders to murder individuals and stage crime scenes, widespread bribery, and ineffectual efforts by the Dominican Republic. But I think the government says in response is fine. How does that tie to your client? There probably needs to be a nexus here. Otherwise we can't just sit there and say that a country has all of these problems. And then that would be a green light basically for granting CAT to every single person in this country or throughout the world, anyone that's ratified CAT, not to go back to that country. That strikes me as dramatically overbroad. And what we're really looking for is I think some degree of nexus between any amount of corruption, bribery, whatever, to this individual petitioner. And so the question is where is that nexus? If anything, the record shows that members of his family were able to get some degree of police protection. Now maybe they had to pay for it. Maybe that was extra. But that shows something different than a willful blindness. That shows a willingness to do something. So a couple of points in response to that, Judge Phipps. Respectfully, I disagree with how you characterize the police response to the attacks to Mr. Abreu's daughters. So there's nothing in the record that suggests that they did anything at all unless and until they were paid by Mr. Abreu's brother to do so. In fairness, is there anything in the record that says that any response by police was needed before that? Well, I mean, the daughters were shot at. One was attacked with chemicals. One left the country. The other remains in the Dominican Republic in hiding. I mean, I think that suggests that there is an ongoing danger. But the second thing that I would point to— It was 12 years ago, wasn't it? The attack on the daughters was about 12 years ago? That's correct, Your Honor. And that brings me to something a little more recent that I want to highlight. Although I will say more broadly we're looking at a cumulative probability of torture. So I think the attacks on the daughters remain very relevant in assessing cumulative probability. But the agency did not consider the Tito threats at all. And that is relevant both to the likelihood of torture, but it's also relevant on government acquiescence. Because the evidence is that there is evidence in the record that Tito has the economic power to bribe the police. And there is country conditions evidence corroborating that that is plausible. And at the very least, if the agency was going to find that unpersuasive, it had to explain why. There is no discussion of Tito, his threats, his brandishing of a firearm anywhere. So maybe just to walk through that, though. I mean, as I understand a lot of the evidence that Tito held some degree of animus against your client, even if your client is found credible, the statements that he's giving of Tito's animus are nested in hearsay. They're statements that Tito told another person who told your client. So a finding that your client is credible cannot extend to the declarant who spoke to your client or even to Tito himself. So to put it blockly, we've got a long game of telephone going on. So even if your client, who was found credible, is credible, that doesn't guarantee that the message that he received across international transmission of time with time delays from other individuals would still be credible. And so it strikes me that when the agency says everything's speculative, they didn't specifically address Tito. But the speculative justification would certainly apply to a long chain of hearsay. And to put it locally, game of telephone. What do you say in response? So I have two points in response principally. First, there is evidence in the record. It's in Mr. Abreu's declarations at pages 247 and 352 of the administrative record. He was texted directly by Tito, a death threat. Now, that would be a statement against interest by Tito. It's in a sworn affidavit by Mr. Abreu. So I think that addresses one of your hearsay issues. The second one regarding Mr. Espinar, again, you know, Mr. Tito's threats, statement against interest, not. Here's a Mr. Espinar's affidavit was a sworn affidavit. So, you know, I think it would be perfectly appropriate and necessary for the agency to consider it in its review. But I'll step back even, you know, one level. None of this is in the agency's decisions. The immigration judge did refer to Espinar, did refer in his opinion to Espinar's affidavit. So to say that he didn't consider it or he ignored it, we can't say that. Can't we assume that when he refers to it, then he considered it? Why would you say he ignored the affidavit? So the reason is that—and so this is at page 100 of the record. It's the IJ's opinion. The IJ characterized Mr. Espinar as having discussed speculative or, quote, veiled threats. And this is what the government relies on. With all respect to the agency and to the government, Tito said, I'm going to kill him. And, oh, by the way, here's the gun I'm going to use to do it. If that's a veiled threat— Veiled is a bit of an unusual word. I mean, if that's a veiled threat, then I shudder to think what an explicit one would look like. Veiled—but the speculative point still plays in. That wasn't said directly to your client. That came through others. And so there is a hearsay component to that, right? Well, Mr. Brewer received a text from Tito that— But not that this is the gun. So true on the text, but not true on the this is the pistol I'm going to kill him with, right? I mean, I—it does implicate the sort of chain that you're describing. But all of that may or may not be a sound basis for the agency to find the Espinar affidavit not particularly persuasive. But it has to say that. I mean, there is no discussion of Tito's explicit death threats, his brandishing of a firearm. And I think—so there's only two ways I think you can interpret the veiled threats quote. The first is that the agency just didn't consider the threats that Tito made. As I said, I don't think any reasonable decision-maker could refer to them as veiled threats. And so I think the most likely explanation is the IJ just didn't consider it. But the other explanation is no better for the government. And that's that, okay, the IJ looked at the evidence and found it wanting. But if that's the case, it utterly failed to comply with its obligations to offer a reasoned basis for its conclusion that these explicit threats amounted to only speculative or veiled threats. So if that's true, right, if everything you say works, that we have a failure to give reasoned consideration to a material part of the record, it seems that the redress is remanded. In your briefs, you ask for more than remand. You ask for direct relief to be given. But the normal rule is if an agency misses something, we don't substitute judicial fact-finding for the agencies. We send it back to the agency. But when I read your brief, it was very front-loaded, and I understand why. It's advocacy. But the first thing that you asked for was for us to just draw the conclusion rather than remand. Is that still your position? And I'd like to hear from you a little more as to why that redress should occur instead of just the remand. So I certainly take the point and agree that direct reversal of an agency is unusual. Although I will say that this court has not been particularly shy in doing so when it feels that the evidence is so compelling that that is warranted. I think the evidence gets there because of the unrebutted evidence in the record about Tito's intent to murder Mr. Abreu if he's returned to the Dominican Republic. But I take the point that that's a heavy burden for me to carry, and a remand is easier for us to get to. And I certainly think remand is appropriate, I mean, at a minimum, because of the deficiencies in the agency's explanations, its consideration of the evidence. But the direct reversal standard is that the evidence is so compelling that no reasonable fact finder or decision maker could reach a conclusion other than that. But you would agree it's hard for an affidavit where there's no opportunity for cross-examination to be deemed so compelling. We really, and I think your point is, we need to figure out exactly how the IJ did view Espinar's affidavit. And for that purpose, a remand is really what has to happen. And the IJ may say, you know, it's an affidavit, it wasn't corroborated by anything, and there's no opportunity for cross-examination. So I have to put it a little lower on the scale. Talk about the other evidence that is in the record. There's a lot of things going on, shot in the foot, and this chemical. Nothing really ties in to the fact that any of these things were on account of what Mr. Abreu had done in terms of, you know, that any of these were some kind of revenge, or there's no, you know, yelling along with those chemicals being thrown saying, you know, this is for your father. And they are very time-wise, you know, a long time ago. Nothing really has happened in the last five or six or seven years. So you have really nothing there other than Espinar's affidavit. So in terms of the connection between the attacks on Mr. Abreu's daughters and his cooperation with the federal government, although there isn't anybody yelling this is for your father, there is a note that says almost verbatim that. There is a note that was given to the daughters around the time that Melissa and Wally were shot at that said, your father is a snitch and threatening them. Nothing's happened since then that would be connected. That's true, at least not in the record as it is right now. Although it is the case that, you know, as I said, one daughter left the country, the other lives in hiding within the Dominican Republic. And the sort of 2018 subsequent report that Melissa had gotten from the Dominican police doesn't indicate that there was ever any, really any action. And his brother's still there, isn't he? His brother is there as far as the record shows. He is there. And like I take the point that that's old. But again, we're talking about a cumulative probability. The Tito evidence is much more recent. And as I think I've addressed, like the agency decision just doesn't get to it at all. So at a minimum, there's a remand on that. And I think, you know, on remand, it would be appropriate for the agency to consider all of this again. I see I'm out of time, unless there are any further questions. Thank you. We'll hear from you on rebuttal. Thank you. We'll hear from the Attorney General now. Good morning, Your Honors. May it please the court, Anne Pogue Donahue on behalf of the Attorney General. This court should deny the petitioner's petition for review from an order of the Board of Immigration Appeals because ample evidence supported the immigration judge's conclusion that the petitioner failed to meet his burden to prove that he was eligible for the relief that he sought below and has failed before this court to demonstrate that the record compels a contrary conclusion. There are two things in this case that stick out to me. They're highly unusual. One is that Abreu was found to be credible. Yes, Your Honor. And he had quite a lot of evidence of things happening to him and his family. So he's found to be credible, and there is a very specific threat in the record here. This is not a situation where, you know, two plus two is four, where, you know, we draw. There is a specific threat. If he comes back here, I'm going to kill him. And then he goes and gets the gun and says, and guess what? This is the gun I'm going to use. And that threat is nowhere mentioned by the IJ. I mean, absolute, Tito's name is never mentioned. The fact that there was an actual threat, not a veiled threat. I mean, if he viewed it as veiled, he certainly had to explain how it was veiled. How can we say that the IJ considered this evidence as he should have? Yes, Your Honor, that's a great question. And I would submit that the IJ did consider this evidence. And there is evidence to support that in the record. So first of all, to put it in context, Your Honor, in the petitioner's closing argument before the IJ, he made no mention of any threats against the petitioner. The petitioner's counsel before the IJ... Why did that matter? Your Honor... I mean, I can remember making arguments and sitting down and saying, oh, I should have mentioned X. You know, is that really the basis to ignore evidence? The judge didn't ignore the evidence, Your Honor. What the petitioner wanted the IJ to focus on below was the acquiescence argument. The petitioner did not mention Tito to the judge at that point. It did not mention any threats. In the petitioner's testimony before the IJ, he did mention people threatening him, and he mentioned that Mr. Espinar told him about a threat from this person named Tito. One threat. And that was the extent of the petitioner's testimony before the IJ, mentioning that Espinar had told him this person named Tito made a threat. But his affidavit was much more fulsome. It was, and I would suggest that it's curious that he didn't testify about that, although he was asked many times what threats he had received. Well, I don't know why that matters, whether, you know, it's emphasized or not. It's definitely in the record in his affidavit. It is in the record, Your Honor. And in Espinar's affidavit as well. That's correct. It only takes one threat sometimes to, you effectuate one threat, you may torture a person, right? So, you know, this isn't how many people are going to make the same threat. Sometimes one very, very, very strong threat suffices for evidence of torture. It sounds like what you're saying is that this just wasn't the issue and that the issue that the IJ was most concerned about was governmental acquiescence. But even if we go down that road, right, it would strike me that we would have to consider acquiescence in light of what would likely happen upon petitioner's return. And when we would look at what would likely happen to gauge acquiescence, we need to kind of consider the full threat assessment, which would then be inclusive of the Tito threat. And so I guess the point is, even if we say we aren't looking to the Tito threat qua threat, we're looking at it for purposes of acquiescence, isn't the IJ's analysis still deficient? No, Your Honor, because both the IJ and, respectfully, both the IJ and the board specifically address threats made against the petitioner. And specifically where the IJ talks, what leads to that conclusion on your part? Yes, Your Honor. On page four of the record is where it is for the board's decision. And on pages 86 through 89. What does he say specifically? So the board states the immigration judge considered evidence of the threats to the respondent, such as threats he claimed to have received from individuals working in the embassy, and then goes on to say the letter... I'm more interested in the IJ, quite frankly. Yes, Your Honor. The... I apologize. Respondent has testified that first believing some threats had come to him from an embassy affiliated with the Dominican Republic, and then goes on to say, unfortunately, has been the victim of crime on two occasions in the United States. These incidents are not... He says these incidents are not related. This is on page 88. I hope you understand that I was flabbergasted that he would discuss and describe the threat about the gun and Tito as a veiled threat. That makes me think that he really, he, the IJ, simply did not give serious consideration to the record. To get evidence like that and then say, well, that's a veiled threat. That's kind of like saying when Sonny gets the fish wrapped up in the newspaper, it's a veiled threat that Luca Brasi is not going to be around anymore. It's more than a veiled threat. It's a pretty direct statement. Your Honor, it is an interesting choice of words. But again, I would suggest that it is clear that the IJ did consider that threat and may have simply thought, as I said, that it was unusual that with the specificity in Mr. Espinar's affidavit, Mr. Espinar did not appear. The petitioner did not testify as to these specifics before the IJ, even though he was asked many times about threats that he had received. The existence of the threat was accepted. If you're arguing that it's not really that credible, that I could understand because it's only on the face of an affidavit, as we've been mentioning. But the IJ accepted, I think appropriately so, accepted the existence of the threat, accepted the context in which it was conveyed, and then said, well, it's veiled. And then labeled all the evidence as just too speculative, which makes me, it gives me pause as to whether or not the IJ really took the record in front of him seriously. Just dismiss all this and say it's too speculative. Now, maybe it would be too speculative, but I would be more convinced of that if there was some serious consideration and mention of Tito and not defining that pretty direct threat in this situation, even to the guys in the Dominican Republic, and not saying that it's veiled. That really makes me, it gives me concern that the record was just simply not taking that seriously, and maybe this was a foregone conclusion that this guy is not going to get relief. Yes, Your Honor. I would suggest that the IJ did appropriately consider all of the evidence in front of him. He referenced the assaults against the daughters. He referenced the assaults against the petitioner. He referenced the threats that the petitioner received over the phone from people who allegedly worked for the embassy. He referenced reported threats that Mr. Espinar related to the petitioner. But I don't think Judge McKee is taking issue with any of those. I think he's taking issue with the IJ's lack of reference specifically to the Tito threats. And, you know, at one level, I get it that IJs don't have to pull out and consider every single piece of evidence and give it reasoned consideration in a voluminous administrative record. Everyone understands that. But probably here, the most significant of the threats are the Tito threats. And maybe just to pivot, I think counsel on the other side recognizes a vulnerability here and is pushing for a very, very, very strong remedy more than just remand. And so it's always awkward to begin to argue if I lose, it shouldn't be that big. But I'd like to hear your thoughts on if we are of the mind that the Tito threats were not adequately considered and given a reasoned explanation, should this case be remanded or should we just enter judgment granting the petition based on kind of, you know, that there would be no other option? What's your take there? Respectfully, Your Honor, I would suggest a third option, which is that even if this court were to determine that the IJ, that the agency did not give sufficient consideration to the threat from Tito, that the court should nevertheless find in the government's favor because the petitioner failed to demonstrate acquiescence or government involvement. But don't you think that any acquiescence consideration would have to account for the Tito threat? So again, respectfully, Your Honor, the IJ did consider this. The only evidence of the specifics of the Tito threat came from Mr. Espinar's affidavit. That is the only place where the specifics of brandishing the firearm are detailed. And the IJ specifically references and the board specifically references the threats related to the petitioner by Mr. Espinar. But the IJ doesn't say, I'm discounting this affidavit. He doesn't say that. And you could not point to anywhere where he really talks about it. And there he talks about speculative veiled threats. Doesn't seem to me he really read the Espinar affidavit. And I have a real concern this man goes back, he could be killed. You know? Isn't that worth the remand to figure this out? No, Your Honor, I would suggest it's not. This is one incident. It is a pretty big one. But it is one incident that happened in 2010 with no follow-on threats from Mr. Tito. And in contrast, the petitioner before the IJ focused much more heavily on the threats, the assaults that had happened against him and the assaults and threats against his family, which the IJ did address in detail. And one of the reasons why the IJ found that the petitioner had failed to establish a likelihood of future persecution was because the assaults against his family occurred so far in the past with no further harm or threats after 2009. And I would suggest the same is true of this threat by Tito. It occurred in 2010 with no further instances. Why are the BIA to do what we said they have to do in my rate? And especially since we're talking here about a government informant, what is the harm to the government? It seems to me the government would actually want a remand to make sure that this guy is not going to be tortured when he goes back to the Dominican Republic. I'm at a loss really to understand the government's position. And I know you're an advocate here and you've got to kind of dance with one of the Bronya, but what's the harm to the government? We remanded it. It didn't do the MIRI analysis. We send it back. The BIA could end up exactly where you're saying it is, but just put it on the record so we have something to review. Respectfully, Your Honor, the IJ did not mention the MIRI decision, but the board did, and the board...  I'm sorry, Your Honor? They mentioned it, but they didn't follow it. Oh, yeah, we know that MIRI thing. The Federal Circuit's always sticking obligations on us like that. But they didn't really follow what we said they had to do in MIRI. Respectfully, Your Honor, I would disagree. The board did follow the MIRI framework and found that... Where did the board conclude, one, what would be likely to happen when he goes back to the Dominican Republic, and two, was it not bad enough to torture it? Specifically, since they did not consider or even mention Tito in their analysis, how could they get to prong two if they don't specifically mention Tito? And whether or not the record is sufficient to show that, because of his wealth or whatever reason, the Dominican Republic would basically let Tito do whatever he wanted to do. Your Honor, the board found that the judge, that the IJ, made a finding that the possibility of anything happening to the petitioner in the future was too speculative, and I would suggest that that is a factual finding. Well, I'd feel better about that, again, if the IJ hadn't looked at the threat as a veiled threat. And I mentioned earlier that that gives me real pause when they say, well, it's too speculative. I'll admit you can make a really strong argument here that the harm is speculative, but I would feel that Abreu got a better and more adequate review of his claims without that veiled assessment of the nature of this very, very direct threat. Your Honor, again, the board and the IJ did mention threats and also looked at how remote in time those threats were. The fact that many of the petitioner's family continue to live in the Dominican Republic and have not been subject to any threats or harm since at least 2010. Well, but the Tito threat was an incident in April of 2018, to be clear. It was not remote in time. Espinar talks about a situation that happened in April of 2018. This is not 2018. I apologize, Your Honor. Yes, it was in 2018, but it was still an isolated incident with no other threats or assaults against either the petitioner or his family subsequent to that time. So how many threats does Tito have to make before those become credible threats? Does he have to show another pistol and say, if I don't kill you with the first one, I'll kill you with the second one? How much more does Tito, how much more, what degree of additional threats is needed here? Your Honor, I don't think that there is a bright line rule because it depends on the totality of the circumstances. And here the IJ did look at the totality of all the circumstances presented to him. The petitioner has not identified a single fact that was presented to the IJ that the IJ did not look at. But you understand if we were to remand this, that we could remand it in a way that would give the IJ a very, very, very clear charge. Please consider and explain with specificity the Tito charges and then evaluate those in the context of how that affects the acquiescence analysis. That would be a very, very, very discreet ask. And the IJ would know exactly what the task was, right? I see that my time has expired. May I respond, Your Honor? Thank you. Respectfully, Your Honor, I would submit that is not necessary because as the IJ appropriately found, the petitioner failed to meet his burden as to government acquiescence and therefore could not prevail on his claim. Thank you very much. Thank you. McGill, we'll hear from you on rebuttal. So, thank you, Your Honor. I have just a couple of quick points on rebuttal. I think that reversal is warranted here, but I don't want to let the perfect be the enemy of the good. We'll be happy with a remand. However, if the court remands, I think it should remand with instructions to reopen the record in full. I didn't get to talk about it much in my opening argument, but there are other deficiencies in the agency's fact-finding related to Mr. Abreu's notoriety as a DEA informant that the IJ didn't consider. Is it already in the record? You said reopen the record. Do you want to be able to put in more evidence? I think that would – I mean, we would like that, but at the very least – That is there. It's clear that his notoriety in terms of him having testified against these folks in the Dominican Republic. There's no doubt about that. Fair enough, Your Honor. Let me rephrase. At least with instructions for the IJ to consider the full record, not just the question of Tito's threats in relation to government acquiescence, because I do think that there's other record evidence that was not adequately considered by the IJ. So you want to remand for, as the APA says, the whole record? Yeah. I mean, I think that would be the most appropriate remedy here, short of, you know, a home run. And I don't want to beat a dead horse, but, I mean, the government refers to the veiled threat language as an interesting choice of words. I would say it's maybe more of a revealing choice of words. There's just – there's no indication. It's ridiculous what it is. Call it interesting or whatever. It's ridiculous. Yes. I think there's no reasonable way to interpret that as a fair consideration of the Tito evidence. Judge Phipps, we talked about hearsay on the first go-around. That wasn't a basis for – I mean, obviously the IJ didn't consider that evidence at all, but a consequence of that is, you know, hearsay was not a basis for disregarding it, and I think Chenery would preclude the court dismissing the petition on that grounds. But on remand, if the IJ were to say, look, it's just too attenuated, I can treat Abreu as credible, but I can't give a full stream of hearsays, that's a different game, that they might be able to do that on remand. We just don't have that now. I don't want to concede that, Your Honor. I mean, I think that is something that the government could argue below. But, you know – I mean, not – but it would be within the discretion of the IJ upon reconsideration of the whole record to discount certain hearsay statements from their overall assessment. Yes, although, as we were discussing earlier, I would quarrel a little bit with just how much hearsay this actually is. There's some reference in the record to your clients thinking that maybe Espinar would appear at the hearing. The question, is he here, added to the witness list, et cetera. What if the IJ wants to hear from him so that there could be an opportunity for cross-examination? I think that would be appropriate. But if we're really concerned about what's going to happen to this gentleman when he goes back to the Dominican Republic, and I am, that might be something that the IJ could open the record to do that, if he wishes. I agree with that 100%. I think the concern is the way the IJ and the BIA looked at the one week of police protection that was afforded for the brother or the family. They looked at that as a positive thing to say that, well, the government's really not acquiescing here because they did protect the family for some point in time. To me, that shows they're corrupt as hell because they only protected them because they were bribed to do it. So I don't see how that very negative thing is looked at as a positive. Oh, look, they did protect them. Yeah, they were bribed. And so they took the payoff and they protected them for a week. And then I guess the brother ran out of money. Judge McKee, so I agree with that 100% that the agency drew exactly the opposite conclusion from that, and that's a legal error. But there's also a reason to fact-finding problem with that too, which is that the agency gave no consideration to the fact that the unrebutted evidence in the record is that Mr. Arrue can't afford to pay for extra protection. So the government quibbles about whether it really was a bribe or not, but that's kind of beside the point because Mr. Arrue can't pay. Well, he shouldn't have to pay. He shouldn't have to bribe the cops in order to get protection. Agreed. If there are any other questions, I'm happy to address them. Otherwise, I will leave. Thank you very much. Also, I understand that you and your firm took this pro bono. Is that correct? That's correct, Your Honor. Well, thank you very much. We really appreciate you doing that endeavor. Thank you. Thank you.